Byron L. Ames (11498)
STONE KALFUS LLP
2750 Rasmussen Road, Suite 201
Park City, Utah 84098
(435) 214-0303
byron.ames@stonekalfus.com

Lance L. Milne (14879)
Joshua S. Ostler (14277)
MORTENSEN & MILNE
68 S. Main Street, Suite 700
Salt Lake City, Utah 84101
(801) 521-4444
lmilne@mortmilnelaw.com
jostler@mortmilnelaw.com

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| David Bidwell, as Personal Representative of the Estate and Heirs of MEGAN JOYCE MOHN,<br><br>Plaintiff,<br><br>v.<br><br>SALT LAKE CITY; JOSHUA HOYLE, in his individual capacity as a Salt Lake City police officer; SHERWIN MANSOURBEIGI, in his individual capacity as a Salt Lake City police officer; DALTON HATCH, in his individual capacity as a Salt Lake City police officer; TODD GOODSELL, in his individual capacity as a Salt Lake City police officer; JOHN AND JANE DOEs 1-10;<br><br>Defendants. | **FIRST AMENDED COMPLAINT**<br><br>**(JURY DEMANDED)**<br><br>Case No.: 2:23-cv-00888-DBB-CMR<br><br>District Judge David Barlow<br>Magistrate Judge Cecilia M. Romero |

Plaintiff David Bidwell, as Personal Representative of the Estate and Heirs of Megan Joyce Mohn, by and through counsel, states and alleges as follows:

**INTRODUCTION**

1. This cause of actions arises out of Megan Joyce Mohn's death on January 30, 2022.

2. This action is brought under 42 U.S.C. § 1983 to redress the deprivation of Megan's clearly established rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution.

3. This action is brought against individual law enforcement officers for their respective violations of Megan's right to be free from the use of excessive force and Salt Lake City, through its police department, for unconstitutional policies, customs and/or practices under *Monell*, *Canton*, and their progeny.

**JURISDICTION & VENUE**

4. This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §§ 1331 & 1343, and 42 U.S.C. §§ 1983 & 1988.

5. Venue is proper in this Court under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the District of Utah. Moreover, on information and belief, all parties to this action reside in the District of Utah.

**THE PARTIES**

6. At all relevant times, and until her death on January 30, 2022, Megan Mohn was a citizen of Utah.

7. Plaintiff resides in Fairfax County, Virginia. He was appointed Personal Representative of the Estate of Megan Mohn by Order entered in Probate Case No. 223902394 in Utah's Third District Court, in and for Salt Lake County.

8. At all relevant times, Defendant Salt Lake City was a political subdivision of the State of Utah, organized and existing under the laws of Utah.

9. At all relevant times, the Salt Lake City Police Department (SLCPD) was a Salt Lake City agency through which the City fulfilled its policing obligations.

10. At all relevant times, Defendant Joshua Hoyle was employed by the SLCPD as a duly appointed and sworn police officer and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

11. On information and belief, Defendant Hoyle is and was at all relevant times, a resident of the State of Utah

12. At all relevant times, Defendant Sherwin Mansourbeigi was employed by the SLCPD as a duly appointed and sworn police officer and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

13. On information and belief, Defendant Mansourbeigi is and was at all relevant times, a resident of the State of Utah.

14. At all relevant times, Defendant Dalton Hatch was employed by the SLCPD as a duly appointed and sworn police officer and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

15. On information and belief, Defendant Hatch is and was at all relevant times, a resident of the State of Utah

16. At all relevant times, Defendant Todd Goodsell was employed by the SLCPD as a duly appointed and sworn police officer and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

17. On information and belief, Defendant Goodsell is and was at all relevant times, a resident of the State of Utah.

18. John and Jane Does include other law enforcement officers who may have confronted and restrained Megan on January 11, 2022, resulting in her untimely death. John and Jane Does may also include the individuals responsible for implementing SLCPD's unconstitutional customs, policies, and/or practices, and training and/or supervising the law enforcement officers who confronted and restrained Megan, causing her death.

## FACTUAL ALLEGATIONS

19. In the early morning hours of January 11, 2022, near the Marathon Petroleum plant in Salt Lake City, Utah, Megan was seen acting suspiciously.

20. It was obvious and apparent that Megan was in crisis and in need of medical attention.

21. On information and belief, Megan was first confronted by an off-duty, plain-clothes officer at or near the petroleum plant.

22. The first on-duty uniformed officer to arrive was Defendant Hoyle. He can be heard on body camera footage describing Megan as walking in circles carrying sticks in the middle of an intersection.

23. According to Defendant Hoyle, he ordered Megan to stop and sit on the ground, and she complied. Megan was handcuffed and placed in custody.

4

24. At this point, Megan was not a threat to anyone.

25. At some point thereafter, a second officer, Defendant Mansourbeigi, arrived.

26. Defendants Hoyle and/or Mansourbeigi asked for Megan's name, which she refused to provide. She asked that they first call "the police" to confirm that they were in fact police officers.

27. When Defendants Hoyle and/or Mansourbeigi refused, Megan screamed and pleaded for help, saying things like, "Help! They're going to KILL ME! Help!" and "[d]on't kill me, I don't want to die."

28. Rather than appreciate Megan's excited condition and state of mind, Defendants Hoyle and/or Mansourbeigi escalated the situation.

29. Any request Megan made, including for a drink of water, was refused unless she told them her name.

30. Defendants Hoyle and/or Mansourbeigi eventually told Megan they would cut off her backpack unless she gave them her name.

31. She responded by yelling, "please don't. HELP! HELP ME! HELP ME! HELP! You need to stop!" She told the officers it was a "good backpack."

32. Knowing that Megan was likely homeless, and that her backpack was how she kept and carried her belongings, Defendants Hoyle and/or Mansourbeigi ignored her pleas and proceeded to ruin the backpack.

33. After cutting one of the straps, Megan started moving around on the ground.

5

34. Defendants Hoyle and Mansourbeigi pinned Megan down in the prone position. After approximately two minutes, a third officer, Defendant Hatch, arrived, cut the second strap of the backpack, and removed it from Megan's person.

35. Rather than release Megan and allow her to sit on the ground in handcuffs, as she had done previously, they continued to keep her pinned face down on the ground in the prone position.

36. In addition to her hands being cuffed behind her back, Defendant Mansourbeigi crossed her ankles and pushed her feet up to her buttocks, like a "hog-tie."



37. Defendants Hoyle and Hatch also had their knees on either side of her back, putting additional pressure on Megan's chest cavity and/or airways.

38. When Defendant Goodsell arrived, he immediately took the place of Defendant Hoyle and continued to put pressure on Megan's back, chest cavity and/or airways.



39. By this point, Megan's backpack had been removed from her person for several minutes.

40. Megan's loud and consistent screams had devolved into periodic and faint muffles from underneath the hood of her coat.

41. There was no discernible reason for Defendants Goodsell, Hatch and Mansourbeigi to continue pinning her down while Defendant Hoyle located leg shackles.

42. Megan was a petite woman, she was handcuffed on the ground, and was never a serious threat to any of the Defendants' safety.

43. Bodycam footage shows that when Defendant Hoyle finally shackled Megan's legs, she was limp and unresponsive. The partial bodycam footage released by SLCPD cuts off after this.

44. Up to this point, Megan had essentially been hog-tied with three officers putting their weight on her for at least 4.5 minutes.

45. On information and belief, CPR was administered to Megan before she was transported by Gold Cross to Salt Lake Regional Hospital in critical condition.

46. After 17 days at Salt Lake Regional, medical personnel determined to transition Megan to hospice care.

47. She died a few days later, on January 30, 2022.

48. The medical examiner determined that Megan's cause of death was "anoxic brain injury" due to "cardiac arrest."

49. As explained in the medical examiner's report, the relationship of cardiac arrest to an occurrence of physical restraint cannot be ignored and is indicative of an asphyxial component precipitating the cardiac arrest.

50. The medical examiner's report found that the trauma experienced by Megan was consistent with choking, "knee on neck" restraint methods.

51. The medical examiner determined that Megan's manner of death was "homicide."

52. Plaintiff made numerous attempts to obtain information from Salt Lake City pursuant to the GRAMA statute. Plaintiff's GRAMA requests were all denied.

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourth Amendment Violation
### Against All Defendants

53. The consensus and clear weight of authority, including in the Tenth Circuit, is that "officers may not apply the hog-tie technique when an individual's diminished capacity is apparent." *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008). More specifically, "breathing problems created by pressure on the back and placement in a prone position, especially when an individual is in a state of 'excited delirium'…lead to asphyxiation." *Id.*; *see also Goode v.*

*Baggett*, 811 F. App'x 227, 233-34 (5th Cir. 2020) ("Relying on a widely circulated medical study, we first found that hog-tying becomes deadly force in certain circumstances – 'when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position.' … [H]og-tying in those circumstances would have violated law clearly established prior to November 1994.")

54. The conduct by the officer Defendants who confronted and restrained Megan on January 11, 2022 constitutes excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, and clearly-established law.

55. At all relevant times, the officer Defendants were acting under color of state law, as agents of Salt Lake City, and within the scope of their employment and authority as duly-certified law enforcement officers.

56. The officer Defendants had no reason to believe that Megan was armed or dangerous.

57. The officer Defendants observed, and even commented on how Megan was under the influence of drugs and in a state of excited delirium.

58. The officer Defendants had no reasonable fear of imminent bodily harm when they pinned Megan face down and kneeled on her.

59. Any reasonable officer would have known that pinning down a petite woman in a prone position, with her legs pinned up like a hog-tie, and with significant weight and pressure on her back, was objectively unreasonable and violated clearly-established law.

60. It was further objectively unreasonable for the officer Defendants to maintain Megan in this position without ever monitoring her breathing or pulse.

61. As a result of the officer Defendants' unjustified, excessive, illegal, and deadly use of force, Megan experienced conscious pain and suffering.

62. As a result of the officer Defendants' unjustified, excessive, illegal, and deadly use of force, Megan died.

63. Each of Defendants Hoyle, Mansourbeigi, Hatch and Goodsell had a duty to intervene on behalf of a citizen whose Constitutional rights were being violated in their presence by a fellow officer.

64. The officer Defendants each knew or should have known that the force being used was excessive and unreasonable under the circumstances.

65. Each of Defendants Hoyle, Mansourbeigi, Hatch and Goodsell was in a position to intervene and stop the other officers' use of unreasonable deadly force against Megan.

66. None of the officer Defendants ever had a reasonable fear of imminent harm, nor did they have a reasonable belief that any other person was in danger of imminent bodily harm from Megan at any point in time.

67. The officer Defendants' respective failures to intervene against the others' use of deadly force violated Megan's clearly-established Fourth Amendment rights.

68. As a result of the officer Defendants' respective failures to intervene, Megan experienced conscious pain and suffering.

69. As a result of the officer Defendants' respective failures to intervene, Megan died.

70. As a direct and proximate result of the acts and omissions described herein, Megan incurred compensatory and special damages as defined under federal common law, in an amount to be determined by a jury.

71.     Punitive damages are available against the officer Defendants and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983).

72.     Plaintiff is entitled to reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 – *Monell* Liability**
**Against Defendant Salt Lake City**

73.     The Mayor, the City Council, and/or the Police Chief had final policymaking authority with regard to establishing written policies and training programs governing the conduct of SLCPD officers performing policing functions on behalf of Salt Lake City.

74.     The Mayor, the City Council, and/or the Police Chief established and/or approved of SLCPD's written policies and training governing the conduct of SLCPD officers performing policing functions.

75.     The written policies and training established and/or approved by the Mayor, the City Council, and/or the Police Chief constitute the official policy of the City and were the moving force behind and caused Megan's injuries and death.

76.     The City made a deliberate and conscious decision to disregard the known risk of harm that would result from SLCPD's unconstitutional patterns and practices and was deliberately indifferent to and/or tacitly authorized the same.

77.     On or prior to January 11, 2022, Salt Lake City, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that failed to provide for the safety of

arrestees, detainees, and the like during arrest, including but not limited to the handcuffing and restraint process.

78. On or prior to January 11, 2022, Salt Lake City, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required officers to turn a blind eye to, and not intervene with, the use of excessive force by other SLCPD officers.

79. On or prior to January 11, 2022, Salt Lake City, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that shall be further identified in discovery.

80. The unconstitutional policies, practices and customs defined herein were the moving force behind Megan's death.

81. Megan died as a proximate result of the acts and omissions by Salt Lake City.

82. As a direct and proximate result of the acts and omissions described herein, Megan suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

83. As a direct and proximate result of these wrongful acts and omissions, Plaintiff has suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by a jury.

84. Plaintiff is entitled to reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

## THIRD CAUSE OF ACTION
## 42 U.S.C. § 1983 – *Canton* Liability
## Against Defendant Salt Lake City

85. Salt Lake City failed to properly train or modify its training of SLCPD officers, including but not limited to, the reasonable and appropriate use of force during arrests, and intervention in the excessive use of force by fellow officers.

86. Effectuating an arrest, using force to effectuate an arrest, and intervening in the use of force is a usual and recurring situation which SLCPD officers encounter on a regular basis.

87. Salt Lake City knew that its officers needed training regarding the use of prone and neck restraints; Salt Lake City was required to provide its officers with such training.

88. With deliberate indifference to the rights of citizens, Salt Lake City failed to provide adequate training to its officers on the use of prone and neck restraints.

89. Salt Lake City was aware that deprivation of the constitutional rights of citizens was likely to result from its lack of training and the failure to modify its training.

90. Salt Lake City was deliberately indifferent and exhibited reckless disregard with respect to the potential violation of constitutional rights.

91. The failure to train and/or to appropriately modify training constituted official Salt Lake City policies, practices, or customs.

92. Salt Lake City's failure to train and/or to modify training was behind the acts and omissions that led to Megan's suffering, pain, injuries, and death.

93. As is apparent from available bodycam footage, the SLCPD officers that confronted and restrained Megan did not understand the law governing the use of force and prone and neck restraints.

94. They apparently believed that they could hog-tie Megan in the prone position and put their collective weight on her for over 4.5 minutes even though she was intoxicated and in a state of excited delirium, and even though she posed no immediate threat to the public or their safety.

95. On information and belief, the City's officer training programs were inadequate in that they did not adequately teach the law and standards set forth in cases like *Tennessee v. Garner*, *Graham v. Connor*, *Scott v. Harris*, and *Weigel v. Broad*, among others.

96. On information and belief, training programs did not contain sufficient materials on use of deadly force, de-escalation, and/or proportionality of the use of force.

97. On information and belief, the City's training materials did not include standard use of force models that make use of force principles easy for officers to understand, such as the Federal Law Enforcement Training Center model:



98. On information and belief, Salt Lake City did not train its officers on use of force on a regular basis.

99. On information and belief, Salt Lake City did not train its officers on proportionality of use of force on a regular basis.

100. On information and belief, Salt Lake City did not train its officers on de-escalation on a regular basis.

101. Salt Lake City was deliberately indifferent to citizens' rights in failing to adequately train officers on use of force, and/or in adopting outdated and deficient training practices.

102. The officer Defendants' illegal treatment of Megan and their apparent lack of understanding of proper use of force and restraints are a direct result of Salt Lake City's failure to properly train its officers.

15

103. As a result of the City's failure to train its officers and/or its maintenance and implementation of unlawful policies, Plaintiff has been damaged in an amount to be determined at trial.

104. Plaintiff is entitled to reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable. *See* Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

Plaintiffs seeks judgment as follows:

1. Plaintiff prays for a money judgment consisting of compensatory, special, and punitive damages, together with attorneys' fees and costs under 42 U.S.C. § 1988 and prejudgment interest.

2. Plaintiff prays for injunctive relief whereby a receiver or person with similar authority is appointed to ensure that Salt Lake City properly trains and supervises its officers with respect to use of force and prone and neck restraints.

3. Plaintiff prays for such other and further relief as the Court deems just and proper.

DATE: January 27, 2025.

**STONE KALFUS, LLP**

/s/ Byron L. Ames
Byron L. Ames

**MORTENSEN & MILNE**

/s/ Joshua S. Ostler
Lance L. Milne
Joshua S. Ostler

*Attorneys for Plaintiff David Bidwell, as Personal Representative of the Estate and Heirs of Megan Joyce Mohn*